Filed 8/21/25  Munguia v. County of San Bernardino CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| FLORENCIO MUNGUIA, | D084661 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CIVDS1900106) |
| COUNTY OF SAN BERNARDINO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Gilbert G. Ochoa, Judge.  Affirmed.

Miller Barondess and Nadia A. Sarkis, Colin H. Rolfs for Defendant and Appellant.

Kramer Trial Lawyers and Daniel Kramer, Teresa A. Johnson; The Pirnia Law Group and Ardy Pirnia; Esner, Chang, Boyer & Murphy and Stuart B. Esner, Rowena J. Dizon for Plaintiff and Respondent.

In this personal injury action, a jury awarded respondent Florencio Munguia $10 million for past and future noneconomic losses, $814,517 in future medical expenses, and $255,000 in past medical expenses. Appellant, the County of San Bernardino (the County), contends the award is excessive, unsupported by the evidence, and was obtained through Munguia's counsel's appeal to the jury's passions and prejudices. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Munguia's Evidence*

In April 2018, an officer employed by the County Sheriff's Department crashed into a vehicle Munguia was driving, injuring him. Munguia sued the County, alleging he suffered medical injuries and damages based on the County's negligence. When the accident occurred, Munguia was 60 years old, and employed as a welder at an auto mechanic shop in San Bernardino.

After the crash, Munguia went to a hospital because he felt pain in his back and elbows. In the following weeks, the pain increased and spread to his neck. Later, Munguia suffered more pain, weakness, tingling, numbness, burning and cramping that extended to his arms and legs. In the summer of 2018, he was treated by a chiropractor. He experienced some relief, but the pain persisted. Although Munguia continued working as a welder, he told his boss he could not do heavy work.

A June 2018 MRI showed Munguia had suffered disc herniation, which matched his subjective reports of neck and back pain, and radiating pain to his upper extremities.

In early 2019, a pain specialist administered four epidural injections to Munguia. The injections provided only temporary relief. In 2019, Munguia also completed several physical therapy sessions for his neck and back pain.

2

The pain from the crash reduced Munguia's ability to sleep soundly at night, requiring him to take over-the-counter medications before going to bed, as well as when the pain woke him up. He also used an over-the-counter ointment. He became irritable because of the pain, which limited his activities.

In 2019, Munguia consulted Dr. Pablo Pazmino, an orthopedic surgeon, who started attending him. Dr. Pazmino recognized that up until then, Munguia had followed a reasonable and conservative course of treatment. He testified: "[W]e have the opportunity to see how [Munguia] was prior to the [vehicular crash] and then the symptoms that he had even meeting me, with several practitioners since the [crash], and his symptoms did not abate. [¶] The symptoms consisted of neck pain and radicular symptoms, which fluctuated, yes, but were persistent . . . . [¶] . . . [¶] So we know everything that was done prior was conservative. The injections helped us pinpoint and confirm that was his pain generator meaning that was the disc which was causing these symptoms[.]"

Dr. Pazmino concluded Munguia was suffering from radiculopathy and his pain was spreading downward from his neck to his shoulder, triceps and forearms. He explained that radiculopathy is "a different type of pain for everybody. So some people feel aching, burning, pinching, throbbing, numbness, tingling, shooting, but, essentially, they can feel all of these different things because that's what the nerve does." He added, "[T]he textbooks all show how radiculopathy can fluctuate, and that's why it's something we have to ask at every visit. We have to get into detail on every visit because sometimes . . . the shooting pain goes away one day, but then you have numbness and tingling again."

3

Dr. Pazmino recommended neck surgery because Munguia "had a disc herniation in the neck and that [was] impinging on the spinal cord." Munguia underwent neck surgery, which alleviated the neck pain and the radiculopathy in his arms. Nevertheless, even at the time of trial, Munguia still was suffering back pain, and radiculopathy in his legs.

Munguia's employer at the time of trial testified that Munguia was limited to doing light work like "oil changes, air filters, minor things where he can bend over quickly, where he wouldn't be sitting there for a long time." Munguia also was "doing muffler work, where it's just pretty much him standing straight up underneath the vehicle, rather than bending over or doing anything like that. [¶] No lifting, no pushing of cars[.]"

Munguia's son testified that following the vehicular crash, Munguia has had no energy left after he finishes work for the day. Munguia has not been able to keep up with maintenance of his home. He is no longer able to enjoy moving around with his grandchildren: "Now, all he does is just stays home. He doesn't do anything. He just stays home and just—basically, just stays and lays in bed. He barely even goes out or barely does any activities at all." Before the crash, one of Munguia's passions was riding his motorcycle with his wife; but he has not been able to resume that activity.

Dr. Pazmino had recommended microdiscectomy or back surgery for Munguia, and also opined that because of the fusion in his neck, Munguia would likely develop adjacent segment disease. He also recommended additional neck surgery. Dr. Pazmino expects that, due to the crash, Munguia will continue to have daily back pain "basically for the rest of his life." He explained that Munguia has not had the recommended back surgery because he needs to keep working in order to support his family. Munguia

testified why he had not had back surgery: "I'm afraid to do it. My son had back surgery, and he's disabled. He cannot work."

Dr. Pazmino testified at length regarding his view of Munguia's required future treatment: "Essentially, we had to delineate for the cervical and lumbar spine a plan, because what if he has flare-ups moving forward. [¶] So, essentially, for the cervical and lumber spine, to monitor these sequentially every year. [Munguia] would need imaging, in terms of X-rays of the cervical spine to monitor the surgery, how it's healing; MRIs annually to make sure there's none of the adjacent pathology we mentioned, and then to monitor the lumbar disc herniations . . . . As we mentioned, these symptoms tend to fluctuate. So if it did fluctuate, he would need treatment to address all the flare-ups, and that would range anywhere from to 12 to 24 sessions of, let's say, physical therapy, chiropractic therapy, acupuncture. Some patients take medications in the form of non-steroidal anti-inflammatories. [¶] So we document . . . how much that would cost over the course of a year for medications. [¶] And then, when he gets these imagings . . . the MRIs, the X-rays, he needs to share them with someone. So we would recommend at least, at a minimum, bi-annual visits with . . . an orthopedic spine surgeon, such as myself, or any spine surgeon if he moves. [¶] So he needs . . . follow-up afterwards to monitor how the lumbar spine is doing and, also, to monitor the cervical spine. [¶] If, in the cervical spine, he does develop adjacent level pathology and it leads to symptoms, and in the lumbar spine, since he's never had the surgery, he may require future epidurals for both the cervical and lumbar spine. Again, cervical spine at those levels, and in the lumbar spine at those levels where the discs are herniated. [¶] And then, finally . . . here's where the things diverge a little in the cervical spine. If he has adjacent level pathology, and he gets treatment, as we just

5

delineated, 12 to 24 sessions of . . . physical therapy, chiropractic, acupuncture, epidural injections, for a total of, let's say, three. [¶] Then, for the cervical spine, if he still has symptoms from the adjacent levels, he may require adjacent level fusion. [¶] And from the lumbar spine, going down a similar path, after conservative modalities, including physical therapy, chiropractic, medications, epidural injections, he may still require the microdiscectomy, as we discussed and showed the video of."

Based on the above, Dr. Pazmino calculated "to a reasonable degree of medical certainty" that Munguia's total future care and costs will be $1,140,017.03 as follows: lumbar surgery or microdiscectomy ($131,806.39), adjacent fusion ($133,260.64), future MRI scans ($47,500), physical therapy ($95,000), medications ($19,950), epidural injections ($655,500), and orthopedic consultations ($57,000).

*The County's Case*

At trial, because the County admitted liability, the jury decided only the issue of damages.

Dr. Cary Alberstone, a neurosurgeon, testified as the County's expert. In June 2022, he performed a medical evaluation of Munguia and interviewed him through an interpreter. Dr. Alberstone agreed the crash caused Munguia's neck and back pain. Dr. Alberstone testified on direct examination that Munguia's medical records did not indicate that he suffered from radiculopathy, nor mention that he experienced tingling or numbness in the extremities. Dr. Alberstone testified that during his medical examination of him, Munguia "indicated to me that he'd never had problems with his arms or legs." He therefore concluded Munguia had never complained of radiculopathy.

6

On cross-examination, Munguia's counsel impeached Dr. Alberstone with an audio recording of his medical examination of Munguia, and the medical records and questionnaires that Munguia had filled out with all of his medical providers, showing Munguia had in fact mentioned symptoms of radiculopathy.

Dr. Alberstone testified regarding Munguia's past medical bills that his medical treaters would accept less than the billed amounts: "In medicine, you know, there's a lot of craziness and, essentially, the medical providers submit bills and they get paid, and there's typically a large discrepancy between the amount billed and the amount paid." However, he acknowledged Munguia was obligated by lien agreements to pay the full medical bills. Dr. Alberstone agreed Munguia will need money for future back surgery or decompression discectomy, though he estimated it would cost significantly less. Dr. Alberstone opined that Munguia "could have gotten all of these services on the basis of Medi-Cal." Nonetheless, he agreed that Medi-Cal patients do not have the same access to care as someone with more economic means. When challenged about his opinions on cross-examination, Dr. Alberstone testified, "I'm simply saying what doctors typically accept to perform the service, and had Mr. Munguia gone to an average physician, he could have paid the type of fees that I've cited."

*Closing Arguments*

In closing arguments, Munguia's counsel urged the jury to award Munguia $17 million for his economic and non-economic damages: "When you appraise it, you come to your verdict, adding up all these or however you see fit—it's an astronomical number that, when you hear it, $17 million; but this is it. And [the County] may say, you know, it's like a lottery ticket. He just wants the lottery. And if I went to [Mr.] Munguia, and I handed him a

7

lottery ticket, and I said, 'Here's a lottery ticket for $17 million . . . but before you could take it, you're going to drive with your family on a nice day, a sheriff's vehicle is going cut in front of you, and you're going to slam in it at 40 miles per hour. Your wife and daughter are going to scream. Your grandson is going to be crying. You're going to have to hold him. You'll start to feel pain in your spine, and you're forever changed. You'll go through years not sleeping. You'll be grumpy. You won't play with your grandkids like you once did. You'll have to keep working. You can't take days off because you support your family. You'll then have to go under the knife. They're going to cut you in your throat and drill into the bones of your spine and take out your disc and fuse it together, and you'll be scared. . . . What happens to your family then? And then once your neck gets better, your back is going to be really bad the rest of your life." At that point, the record transcript shows the court interrupted counsel's argument and announced a recess.

In closing arguments, the County's attorney argued to the jury that it should award Munguia at the most $45,000 as past economic damages for the entire course of Munguia's treatment.

Regarding past noneconomic loss, counsel argued, "What is his physical pain, mental suffering, loss of enjoyment of life, and physical impairment worth? Well, that's ultimately for you to decide." Counsel proposed, "Based on figures—the figure of past economic damages, an amount of $16,000, that would equate to $48,000." However, counsel allowed that the jury could award up to $135,000 for noneconomic loss.

As for future medical expenses and future noneconomic loss, the County argued that "no evidentiary basis was established for the need for lumbar surgery. So you can . . . put zero here [on the special verdict form]."

Counsel added as to future medical expenses, "However, if you are of the mind that this accident caused [Munguia's] need for a lumbar surgery, then based on Dr. Alberstone's estimates, the reasonable amount is $13,500."

The County's counsel summarized, "Quite frankly, you should be insulted by what [Munguia] is asking for, $17 million. That is why I urge that the total reasonable amount to compensate [him] for this impact is $64,000. [¶] However, if you find that [Munguia] has satisfied his burden . . . then the reasonable amount is $180,000. Now, we ask that you consider what is reasonable based on common sense."

*Jury Instructions*

The court instructed the jury with CACI No. 3901, requiring it to compensate Munguia for each item of past and future noneconomic damages: "The amount of damages must include an award for each item of harm that was caused by [the County employee's] wrongful conduct, even if the particular harm could not have been anticipated. [¶] Mr. Munguia does not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages."

The court instructed the jury with CACI No. 3905 that Munguia was claiming these specific items of noneconomic damage: physical pain; mental suffering; loss of enjoyment of life; physical impairment; inconvenience; grief; anxiety; humiliation; and emotional distress.

The jury was instructed with CACI No. 3905A on how to determine noneconomic damages: "No fixed standard exists for deciding the amount of these noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense. To recover for future physical pain, mental suffering, loss of enjoyment of life,

9

inconvenience, physical impairment, grief, anxiety, humiliation, and emotional distress, Mr. Munguia must prove that [he] is reasonably certain to suffer that harm."

The court's instruction with CACI No. 3924 admonished the jury not to impose punitive damages: "You must not include in your award any damages to punish [the County]. You must award only the damages that fairly compensate Mr. Munguia for his loss." Another instruction given, CACI No. 117, stated that the parties' "wealth or poverty is not relevant to any of the issues that you must decide."

The court instructed the jury with CACl No. 3903A: "[T]o recover damages for future medical expenses, Mr. Munguia must prove the reasonable cost of reasonably necessary medical care that he is reasonably certain to need in the future."

The court instructed the jury with CACI No. 221 regarding conflicting expert testimony: "If the expert witnesses disagreed with one another, you should weigh each opinion against the others. You should examine the reasons given for each opinion and the facts or other matters that each witness relied on. You may also compare the experts' qualifications."

*Jury Deliberations and Verdict*

During deliberations, the jury asked two questions: First, "It was mentioned that Mr. Munguia owed money for his medical expenses. The words medical lien were used. What are the implications and definitions related to this terminology[?]" The court responded: "A medical lien is like credit. If there is an award, the lien would be paid out of the proceeds. If there is no award or an insufficient award, the plaintiff remains liable for the bill."

10

Second, the jury requested that both parties provide their respective "breakdowns" of Munguia's future medical expenses, and the identity of the person "who came up with the numbers." Munguia's counsel relied on Dr. Pazmino's testimony and responded he sought $1,140,017.03 "[b]ased on a 19.2-year life expectancy," as stated in a jury instruction.[1] Counsel included amounts for a microdiscectomy, annual MRIs, physical therapy, medications and epidural injections.

The County responded to the jury's request by relying on Dr. Alberstone's testimony, and claimed a total of $13,500 for Munguia's back surgery. Counsel argued that no other amounts should be awarded for any other surgery, medications, MRIs, physical therapy, or biannual orthopedic consultations. He added, "Dr. Alberstone testified that the future treatment is not necessary and not reasonable as a result of this accident."

In August 2023, the jury by special verdict awarded Munguia a total of $11,069,517: $255,000 for past economic damages, $814,517 for future economic damages, $6 million for past noneconomic damages, and $4 million for future noneconomic damages. The noneconomic damages included "physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation and emotional distress."

---

[1]    The court instructed the jury with CACI No. 3932 regarding Munguia's life expectancy: "If you decide Mr. Munguia has suffered damages that will continue for the rest of [his] life, you must determine how long he will probably live. According to the Vital Statistics of the United States Life Expectancy Table—Male, a 65-year old male is expected to live another 19.2 years. This is the average life expectancy. Some people live longer and others die sooner. [¶] This published information is evidence of how long a person is likely to live but is not conclusive. In deciding a person's life expectancy, you should also consider, among other factors, that person's health, habits, activities, lifestyle, and occupation."

11

*New Trial Motion*

The County moved for a new trial, arguing insufficient evidence supported the award for noneconomic damages, which were excessive. It also argued the future economic damages award was "speculative in nature as to causation" and excessive. Munguia opposed the motion, arguing the evidence supported the damages award. The court denied the County's motion.

DISCUSSION

I. *Noneconomic Damages Award*

The County concedes Munguia "suffered a serious injury," and that he "was entitled to some measure of past noneconomic damages." Nonetheless, it contends the jury's $10 million past and future noneconomic damages award is " grossly excessive by any measure."[2]

As to Munguia's future medical expenses, the County contends it is "untethered to any actual evidence." It adds that Munguia was only entitled to recover such damages as are reasonably certain to occur, "and there was *zero evidence* to support his worst-case scenario."

A. *Applicable Law*

The amount of damages to be awarded is a question of fact committed, first to the discretion of the trier of fact, and then to the discretion of the trial court on a motion for new trial. (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506.) "The amount to be awarded is 'a matter on which there legitimately may be a wide difference of opinion.' " (*Id.* at p. 508.) We can interfere if the verdict is so large that, "at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Id.* at p. 507.) There is no fixed standard by which we can determine whether a

---

2      The County does not challenge the jury's award of $255,000 in past economic damages.

12

jury's award for this intangible loss of comfort and society is excessive. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 615.) In the absence of some factor in the record such as inflammatory evidence, misleading instructions or improper argument by counsel that would suggest the jury relied upon improper considerations, we usually defer to the jury's discretion. (*Ibid.*) The fact that the verdict is very large does not alone compel the conclusion the award was attributable to passion or prejudice. (*Ibid.*) In assessing a claim that the jury's award of damages is excessive, we do not reassess the credibility of witnesses or reweigh the evidence. (*Huang v. Board of Directors* (1990) 220 Cal.App.3d 1286, 1294.) We consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor. (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078.)

The difficulty inherent in assessing damages is plainly evident when noneconomic damages such as pain and suffering are at issue: " 'One of the most difficult tasks imposed upon a jury in deciding a case involving personal injuries is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering. No method is available to the jury by which it can objectively evaluate such damages, and no witness may express his subjective opinion on the matter. [Citation.] In a very real sense, the jury is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy.' " (*Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 764; see *Capelouto v. Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 896 ["even in the absence of any explicit evidence showing pain, the jury may infer such pain, if the injury is such that the jury in its common experience knows it is normally accompanied by pain"].) Moreover, "[n]oneconomic damages do not consist of

13

only emotional distress and pain and suffering. They also consist of such items as invasion of a person's bodily integrity (i.e., the fact of the injury itself), disfigurement, disability, impaired enjoyment of life, susceptibility to future harm or injury, and a shortened life expectancy." (*Buell-Wilson v. Ford Motor Co.* (2006) 141 Cal.App.4th 525, 549, judg. vacated on other grounds and cause remanded *sub nom. Ford Motor Co. v. Buell-Wilson* (2007) 550 U.S. 931 [127 S.Ct. 2250, 167 L.Ed.2d 1087].)

We review the jury's damages award for substantial evidence, giving due deference to its verdict and the trial court's denial of the new trial motion. (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 720.)

B. *Analysis*

Sufficient evidence from Dr. Pazmino supports the jury's verdict. Dr. Pazmino testified that Munguia will have to live with pain for the rest of his life, and will therefore require surgery, ongoing treatments, tests and scans. Dr. Pazmino testified that each item of future care and future medical bill set forth was calculated to a reasonable degree of medical certainty. The trial evidence showed that since the crash, Munguia has had difficulty sleeping, his ongoing pain and suffering has impacted his quality of life by limiting his ability to partake in activities with his grandchildren and in other pursuits that previously added to his enjoyment of life. As stated, there is no fixed standard for evaluating a jury's award for this kind of noneconomic loss. (*Rufo v. Simpson, supra,* 86 Cal.App.4th at p. 615.) The record shows the jury here took its task seriously, as it asked the parties to provide a breakdown of their claims for noneconomic damages, and the source for their calculations. The verdict points to the jury complying with CACI No. 221 regarding how to resolve the wide gap between the experts' calculations. By

14

its verdict, we infer the jury found Munguia's expert's testimony more persuasive.

It is noteworthy that the jury did not award Munguia the total amount he sought. And it clearly rejected the County's proposed damages as being unreasonably low. Rather, its verdict reflects that its deliberations were guided by the different instructions regarding how to calculate damages. In that context, the jury could have reasonably concluded that the factual basis of Dr. Alberstone's low calculation of damages—that Munguia did not complain about radiculopathy—was impeached on cross-examination by evidence that in fact Munguia had consistently reported suffering from symptoms of radiculopathy. Finally, as stated, in denying the County's new trial motion, the court rejected the claim the verdict was excessive or shocked the conscience such as to suggest it was based on prejudice or passion.

We have no basis to reverse the verdict in light of the settled case law cited above regarding the deference we accord to the jury's verdict and the trial court's denial of the new trial motion. We "defer to the trial court's denial of a new trial motion based on excessive damages because of the trial judge's greater familiarity with the case. The amount awarded is peculiarly within the jury's discretion." (*Mendoza v. City of West Covina, supra,* 206 Cal.App.4th at p. 720.)

The County argues this award here is "nearly 20 times" the amount that this court found justified in *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 302 (*Bigler-Engler*). But this comparison does not account for the role of inflation, given that the jury there made its award in 2012 (*id.* at p. 289), while the jury's award here issued in 2023, more than a decade later. Moreover, in *Bigler-Engler*, a medical malpractice case, although the plaintiff suffered a serious injury, she was improving with "excellent

15

recovery" and "doing well physically and mentally." (*Id. at* p. 302.) The County additionally compares the size of the damages award here with verdicts in other cases—specifically to *Qaadir v. Figueroa* (2021) 67 Cal.App.5th 790, 795; *Pebley v. Santa Clara Organics LLC* (2018) 22 Cal.App.5th 1266, 1270-1271; *Bean v. Pacific Coast Elevator Corp*. (2015) 234 Cal.App.4th 1423, 1426; *Cobb v. County of Los Angeles* (May 1, 2019, B287090) [nonpub. opn.]; and *Collins v. Union Pacific Railroad Co.* (2012) 207 Cal.App.4th 867, 873-875. We agree with a court that has stated, "Comparing verdicts, however, is of limited utility. While an appellate court 'should consider the amounts awarded in prior cases for similar injuries, obviously, each case must be decided on its own facts and circumstances. Such examination demonstrates that such awards vary greatly. [Citations.] Injuries are seldom identical and the amount of pain and suffering involved in similar physical injuries varies widely.' " (*Fernandez v. Jimenez* (2019) 40 Cal.App.5th 482, 490.)

Further, the California Supreme Court has stated regarding a party's reliance on a compilation of judgments which had been reversed as excessive: "Those cases do not, in and of themselves, mandate a reversal here. The vast variety of and disparity between awards in other cases demonstrate that injuries can seldom be measured on the same scale. The measure of damages suffered is a factual question and as such is a subject particularly within the province of the trier of fact. For a reviewing court to upset a jury's factual determination on the basis of what other juries awarded to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of factfinding. [Citations.] Thus, we adhere to the previously announced and historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most

16

favorably to the judgment, indicates were rendered as the result of passion and prejudice on the part of the jurors." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65, fn. 12.)

## II. *Future Medical Expenses*

The County argues: "No more than $76,800 in future medical expenses is supported by the record. The award of $814,517 for future medical expenses should be reduced to $76,800." The County bases its argument on Dr. Pazmino's use of conditional terms like "if" and "may" during his testimony, as set forth above. However, Dr. Pazmino was testifying against the backdrop of his diagnosis that Munguia suffered from radiculopathy, which will affect him for the rest of his life. Because the symptoms of that condition fluctuate, new tests will be required at every medical appointment to accurately evaluate and manage his care. But when Dr. Pazmino subsequently testified about Munguia's future care recommendations and calculations, as stated, he did so without conditions and "to a reasonable degree of medical certainty."

The County also argues that Munguia "had already turned down lumbar surgery," but the record does not support that assertion. Instead, it only supports that up to the time of trial, Munguia had not yet decided to undergo the surgery, as he was concerned about his having to miss work and about the lasting impact of such surgery in light of his son's experience. In view of Dr. Pazmino's testimony that Munguia will have to live with pain that fluctuates, the jury could reasonably conclude, under the instructions given, that there was a reasonable degree of medical certainty that Munguia would decide to undertake the surgery to address the pain in his back, especially if he did not have to pay for it with another medical lien.

17

## III.  *Claim of Passion and Prejudice*

The County contends:  "There can be no doubt in this case that improper attorney argument infected the verdict.  [Munguia's] counsel's closing argument reads like a case study on how to inflame a jury's passion and prejudice and successfully deflected the jurors from their task, which was to render a verdict based on the evidence admitted at trial."  Specifically, the County argues Munguia's counsel "doggedly chastised the County for taking the case to trial and said its decision to do so reflected that the County did not think [Munguia] was 'worth much as a person.'  . . .  Counsel argued it was 'not okay' for the County to bring its defense 'into a court of law in front of a jury,' calling its defense an 'insult to the jury.'  [¶]  Repeatedly attacking the County as callous and only concerned with getting a 'discount,' [Munguia's] counsel asked the jury to send the County a message and hold it 'accountable':  'You make them see by your decision.'  Then as the topper, [he] invoked the Golden Rule and asked the jurors to put themselves in [Munguia's] shoes, asking them to consider what it would feel like to have their throats cut, hearing their family members scream in distress, and finish out their lives in extreme pain, when considering [Munguia's] demand for $16 million in noneconomic damages."

### A.  *Applicable Law*

The California Supreme Court has explained:  "In conducting closing argument, attorneys for both sides have wide latitude to discuss the case. ' " ' "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom. The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of

the jury." ' " "Counsel may vigorously argue his case and is not limited to 'Chesterfieldian politeness.' " . . . "Only the most persuasive reasons justify handcuffing attorneys in the exercise of their advocacy within the bounds of propriety." ' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795-796.)

This court has summarized the rules regarding improper closing arguments: " 'The law, like boxing, prohibits hitting below the belt. The basic rule forbids an attorney to pander to the prejudice, passion or sympathy of the jury.' [Citation.] 'The rule also manifests itself by prohibiting irrelevant ad hominem attacks.' [Citation.] 'Personal attacks on the character or motives of the adverse party, his counsel or his witnesses are misconduct.' " (*Bigler-Engler, supra,* 7 Cal.App.5th at p. 295.)

The County relies on *Bigler-Engler* for its claim that, as assertedly happened here, "[s]uch tactics inevitably result in damages awards that are excessive as a matter of law and require appellate intervention." It argues, "The size of the noneconomic damages award alone suggests that [Munguia's] counsel's arguments influenced the jury to award an amount not motivated simply by a desire to compensate [Munguia] but instead to punish the County."

B. *Analysis*

This case is distinguishable from *Bigler-Engler, supra,* 7 Cal.App.5th 276, in which plaintiff Engler sued her medical doctor for malpractice and a device manufacturer for design defect, among other causes of action, for injuries she suffered as a result of using a device at her doctor's recommendation. (*Id.* at p. 284.) This court concluded: "The lack of evidence supporting the jury's award and the disproportionality of the award . . . suggest the jury failed to base its award solely on the evidence and was influenced by improper factors. Our detailed review of the record confirms

19

this conclusion." (*Bigler-Engler, supra,* at p. 304.) We specifically pointed out the plaintiff's counsel "asked questions about impermissible or excluded matters, suggesting to the jury that they were not hearing all of the relevant evidence, and made comments denigrating the court and defense counsel." (*Ibid*.) We added: "Key portions of [counsel's] opening statement and closing argument, as well as witness examinations, concerned injuries suffered by individuals other than Engler[,]" (*ibid*.) which "appears to have improperly influenced the jury, leading it to award damages taking into account injuries other than Engler's." (*Ibid*.) We also cited to two "episodes of overheated, emotional rhetoric . . . in [counsel's] closing argument." (*Ibid*.)[3]

---

[3]    In *Bigler-Engler*, this court outlined the objectionable conduct that plaintiff's counsel engaged in: "[Counsel's] disrespect extended to the court. [Counsel] repeatedly violated the court's in limine rulings. Contrary to the court's orders, [Counsel] asked about a defense expert's history of malpractice claims, suggested [the medical doctor] had been involved in other malpractice suits, . . . detailed relationships between [defendants] unrelated to the . . . device . . . . [Counsel] persisted in asking questions despite sustained objections and made improper speaking objections in front of the jury. [¶] Many of these violations drew objections, which were for the most part sustained. At one point, the court remarked on the persistence with which [Counsel] pursued objectionable topics. In the presence of the jury, the court stated, 'I'm waiting for the point in the trial to say to you: What is it about the meaning of the word 'no' that you do not understand.' [Counsel] responded, 'You're sounding like my mother.' The transcript reflects laughter at that point. [¶] In response to a motion for mistrial, the court recognized [Counsel's] conduct during the first week of trial had been improper, but the court denied the motion. The court explained, ' . . . I mean jurors are not stupid, and I think when [counsel] becomes aggressive, makes inappropriate remarks, this may not have a very positive effect on his case . . . . I think having numerous objections sustained, being admonished by the court, making inappropriate comments about, you know, comparing the defense attorneys to swine, you know, I mean the jury sees all of this.' A week later, the court told [counsel] he was 'pushing the envelope' by asking questions in violation of in limine rulings." (*Bigler-Engler, supra,* 7 Cal.App.5th at pp. 293-294.)

By contrast here, the County has not pointed us to instances of attorney misconduct, disrespect towards opposing counsel or the court. Although not dispositive, the County has not even pointed to instances where it objected to Munguia's counsel's conduct or arguments during the trial. Had it done so at trial, it would have given the court an opportunity to timely address the matter. Furthermore, it would have reduced the impression of post hoc reasoning for its present claims that Munguia's counsel made improper closing arguments.

We have reviewed Munguia's counsel's closing arguments and do not find them improper or egregious. We therefore need only address briefly two of the County's specific contentions. First, it contends that Munguia's counsel "doggedly chastised the County for taking the case to trial and said its decision to do so reflected that the County did not think [p]laintiff was 'worth much as a person.'" The context for this contention is that at the start of his closing argument, Munguia's counsel surmised that the County in its closing argument was "going to talk about [Munguia's] worth, about what he's worth as a human being. Because ultimately this case is about his worth as a human being, and as you'll see, they don't think he's worth much as a person."

Mungia's counsel elaborated on this point by interpreting Dr. Alberstone's testimony, which he quoted: " 'Well, someone like Mr. Munguia should go to just an average physician.' Think about that for a second. He should go to an average physician. I know he doesn't have much means. I know it's a lot harder to get good care; that they're doing surgery on your spine—on his spine that could cause death or paralysis—'ah, go to an average physician.' Is that what they're saying? [¶] Dr. Pazmino, who—like he said, is one of the few Spanish-speaking orthopedic surgeons in the area, clearly

21

cares for his patients[,] is the treater, not some hired gun. He's a top doctor, did great surgery. [¶] Mr. Munguia felt great with him. 'Finally, I get someone who really hears me. All the hell I've been going through, he finally hears. He could help me.' [¶] 'That doctor,' according to the County, 'is too good for someone like Florencio Munguia. Too good. He should go to these average doctors. Average.' [¶] That's insulting. This is what I'm talking about their final gamble is about his worth as a person. That he's not good enough. 'Cut his bills down because he should go to these average doctors.' Nothing against average doctors, but they're saying, 'he's not good enough.' [¶] That's not right. Dr. Alberstone who really says, who's not an average doctor, says 'I'm not here to testify what's right or wrong about our society.' That's the problem. What he's doing is the problem. They want a discount."

Munguia's use of Dr. Alberstone's own words to undermine his claim that medical providers would accept less than they actually billed was not improper. It was a fair comment on the testimony. Additionally, in effect, this was counsel's shorthand summation of the court's instruction with CACI No. 3901 on tort damages: "If you decide that Mr. Munguia was harmed and that [the County's] negligence was a substantial factor in causing the harm, you also must decide how much money will reasonably compensate Mr. Munguia for the harm. This compensation is called 'damages.'" Counsel was advising the jury that the County's calculation and potential recommendation for damages would be significantly less than Munguia's, based on the County's evaluation of his worth. This was a permissible argument based on the facts and law in this case.

Second, the County argues that Munguia's counsel invoked the golden rule argument, in which counsel requests jurors put themselves in the plaintiff's shoes and ask what compensation they would personally expect.

22

The County refers to when, as set forth above, Munguia's counsel discussed the possibility the County would consider Munguia's request of $17 million in damages as akin to winning the lottery ticket. Munguia's counsel countered that impression by stating that Mr. Munguia would probably not regard it as good fortune to have to undergo a crash, suffer pain, lose sleep, become irritable, and get operated on as the price to pay for that lottery ticket.

The law provides: "The jury must impartially determine pain and suffering damages based upon evidence specific to the plaintiff, as opposed to statistical data concerning the public at large. The only person whose pain and suffering is relevant in calculating a general damage award is the plaintiff. How others would feel if placed in the plaintiff's position is irrelevant. It is improper, for example, for an attorney to ask jurors how much 'they would "charge" to undergo equivalent pain and suffering.'" (*Loth v. Truck-A-Way Corp., supra,* 60 Cal.App.4th at pp. 764-765, fn. omitted.) "The evil of such argument is that it risks converting the jurors from impartial decision makers into personal partisans." (*Cassim v. Allstate Ins. Co., supra,* 33 Cal.4th at p. 798.)

Here, Munguia's counsel did not ask the jurors to put themselves in Munguia's place and thereby undermine the impartiality of the verdict. (*See Cassim v. Allstate Ins. Co., supra*, 33 Cal.4th at pp. 797-798.) Rather, counsel explained that Munguia was seeking recovery for actual injuries he sustained and, logically, would not have made the choice to suffer those injuries in exchange for payment. We conclude the disputed argument was not improper.

23

## DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.

O'ROURKE, Acting P. J.

WE CONCUR:

BUCHANAN, J.

KELETY, J.